IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

AUG 25 2009

```
_____
AIR LINE PILOTS ASSOCIATION,  )
INTERNATIONAL,                )
                             )
            Plaintiff,        )
V.                            )     Civil Action No. 1:09cv222
                             )
U.S. AIRWAYS GROUP, INC.,     )
et al.,                       )
            Defendants.       )
_____)
```

## MEMORANDUM OPINION

This case is before the Court on Defendants' US Airways Group, Inc. ("Group") and US Airways, Inc. ("Airways"), Joint Motion to Dismiss, and Defendants' Piedmont Airlines, Inc. ("Piedmont") and PSA Airlines, Inc. ("PSA") Joint Motion To Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

Plaintiff Air Line Pilots Association ("ALPA"), which represents pilots at PSA Airlines, Inc. ("PSA") and Piedmont Airlines, Inc. ("Piedmont"), filed a two-count lawsuit against Group, as well as against its wholly-owned air carrier subsidiaries, Airways, PSA, and Piedmont, seeking injunctive and declaratory relief.

Count One of the Complaint alleges that the Railway Labor Act (the "RLA"), 45 U.S.C. §§ 151-188, requires Group and Airways, as well as PSA and Piedmont, to create a multi-carrier

board of adjustment to hear the grievances of PSA and Piedmont pilots related to alleged flow-through rights.

Count Two of the Complaint alleges that Group has breached its contractual commitments to arbitrate disputes over its contractual undertakings.

Defendant Group is a holding company that owns Defendants Airways, PSA and Piedmont.  Defendants Airways, PSA and Piedmont are each carriers by air, as defined in Section 201 of the RLA. 45 U.S.C. § 181.  ALPA had previously represented pilots at all three carriers, but on April 18, 2008, the US Airline Pilots Association ("USAPA") displaced ALPA as the union representing pilots employed by Airways.  ALPA continues to represent pilots employed by PSA and Piedmont.

Group, Airways and ALPA, on behalf of the Airways pilots, entered into a letter of agreement in 2002 in which Group and Airways sought cost-cutting concessions from the Airways pilots (the "2002 Restructuring Agreement"), though they subsequently had to file for bankruptcy protection.  As the preamble to the 2002 Restructuring Agreement states, the agreement was "made and entered into . . . by and between US Airways Group, Inc. and US Airways, Inc. . . . and the Airline Pilots in the service of US Airways, Inc. as represented by" ALPA.  The signatories to the 2002 Restructuring Agreement were Group, Airways, and ALPA.

The 2002 Restructuring Agreement references potential "Flows

-2-

between Carriers," providing, in part, that "[f]ollowing the recall of all furloughed US Airways pilots, pilots employed by a [Participating Wholly-Owned Carrier] [PWOC] shall be eligible to flow through to any new-hire US Airways pilot positions in order of their seniority position on the integrated seniority list of pilots of Wholly-Owned Carriers . . . ." It further provides that "[p]ilots employed by a [PWOC] who become MDA [Mid-Atlantic Airways, Inc.] pilots or US Airways pilots under this Attachment B, may flow back to their respective [PWOC]. US Airways pilots employed by MDA, if furloughed . . ., may displace into positions at [PWOC] in order of their seniority . . . ." However, the Agreement also indicates that procedures for such "flow" are "to be discussed." There is no allegation that such discussions have ever been concluded.

Airways and ALPA entered into another letter of agreement, Letter of Agreement 91 ("LOA 91"), in May 2004, entitled "Consolidated Small Jet Agreement." Unlike the 2002 Restructuring Agreement, however, Group was not a signatory to LOA 91. As the preamble to LOA 91 states, the agreement was made "by and between US Airways, Inc. (hereinafter referred to as the 'Company') . . . and the Airline Pilots in the service of US Airways, Inc. as represented by" ALPA. LOA 91 was signed by ALPA and Airways, but not by Group.

LOA 91 also contains a provision labeled "Flows between

-3-

Carriers," that states, in part, that "flow" would occur "in accordance with the Flow Through Letter of Agreement (LOA #_tbd__) to be agreed to by the Company and the Association." There is no allegation that any such letter has ever been agreed upon.

In 2002, Piedmont and its pilots, represented by ALPA, also entered into a restructuring agreement for cost-cutting concessions from the Piedmont pilots (the "Piedmont Restructuring Agreement"). Section D of the Piedmont Restructuring Agreement refers to "entitling Piedmont pilots" to "flow through to US Airways." Yet, only ALPA and Piedmont were signatories to the Piedmont Restructuring Agreement.

The arbitration decision cited by ALPA in its Complaint (the "Wittenberg Award") interpreted the Piedmont Restructuring Agreement. The issue presented in the Wittenberg Award was "whether Piedmont . . . violated the Agreement, including Section D of the Restructuring Agreement by failing to provide regional jets for the airline." The Wittenberg Award found that "[t]he record establishes that the Allegheny [which merged with Piedmont] pilots understood that the language in D.1 was not an enforceable commitment for regional jets . . . because the guarantee could only be delivered on by Airways, not Allegheny. The [Piedmont] Restructuring Agreement could not bring the guarantees sought by the pilots because the only party capable of

-4-

delivering the jets was not a signatory to that Agreement." The Wittenberg Award denied ALPA's grievance. It also found that "[d]espite being a wholly-owned subsidiary, Piedmont is an independently operated airline."

In 2002, PSA and ALPA entered into a letter of agreement, entitled "Small Jet Aircraft and Cost Reductions" ("LOA 3"). That agreement, "by and between PSA Airlines, Inc. . . . and the pilots in the service of PSA Airlines, Inc. as represented by" ALPA, was accordingly signed by PSA and ALPA. The agreement does not specifically reference "flow-through," but ALPA alleges that upon ratification of LOA 3, PSA became a PWOC.

In 2004, PSA and ALPA entered into another letter of agreement, entitled "Regional Jet Aircraft" ("LOA 8"). As with LOA 3, this agreement was between PSA and "the pilots in the service of PSA Airlines, Inc. as represented by" ALPA. PSA and ALPA were again the only signatories to this agreement. The agreement contains a dispute resolution procedure, which is limited to paragraphs four through eight of LOA 8 and which lists Group, PSA and ALPA as the parties to participate in dispute resolution. Group, however, was not a signatory to the agreement.

On August 22, 2007, ALPA, on behalf of Piedmont pilots, sent a letter to Airways and Piedmont. The letter, which purported to be a contract grievance, complained of "failure . . . to honor

the 'flow-through' rights" of Piedmont pilots.  Airways responded on September 4, 2007, stating that "there is no mechanism for Piedmont pilots to file a grievance against US Airways, as US Airways is neither their employer nor a party to any collective bargaining agreement with the Piedmont pilots."  Piedmont responded on September 21, 2007, stating that no agreement on how to implement flow-through had been reached between the ALPA groups (Airways ALPA, Piedmont ALPA, and PSA ALPA) or between Airways and ALPA, and therefore, the grievance was denied.

ALPA in turn responded in two ways.  First, on October 12, 2007, ALPA sent a letter to Piedmont and Airways requesting the creation of a "Special Board of Adjustment" with jurisdiction over Piedmont, Airways, and PSA.  Second, ALPA invoked the jurisdiction of the Piedmont/ALPA System Board of Adjustment to hear the dispute.

ALPA made its first submission to the Piedmont Board of Adjustment on October 19, 2007, and identified the issues for resolution as whether Piedmont had failed to (1) "ensure that US Airways, Inc. compl[ies] with its obligation to offer flow-through to the pilot group . . . as set forth in Section D.3. of the 2002 [Piedmont] Restructuring Agreement"; and (2) "ensure" that Airways comply with flow-through obligations in order of seniority "as provided for by the 'Small Jets Agreement' in Attachment B, page 9 of the 2002 Restructuring Agreement."

-6-

This submission did not present any question as to Airways' or Groups' actions, but was limited to Piedmont's actions.

On October 26, 2007, ALPA amended its submission to the Piedmont Board of Adjustment by adding the following question: "[a]re US Airways and its new-hired pilots involved in this dispute, and, if so, should they be given notice of this proceeding and invited to participate as non-voting parties to this adjustment proceeding?"  ALPA also added to the question of remedy whether an appropriate remedy would include "the remedy to give this Board or an expanded board jurisdiction over US Airways and its pilots."  There is no allegation in the Complaint, however, that ALPA ever processed the grievance to the Piedmont Board of Adjustment for hearing of its claim for flow-through rights and its requested remedy.

Similarly, on March 2, 2008, ALPA sent a letter to Airways and PSA on behalf of the PSA pilots asserting that the ALPA-PSA collective bargaining agreement, as amended by LOA 3 and LOA 8, created enforceable flow-through rights for PSA pilots.  Again, there is no allegation in the Complaint that ALPA processed this grievance to the PSA Board of Adjustment for hearing of its claim.

On January 12, 2009, ALPA sent a letter to Group, Airways, PSA, Piedmont and USAPA regarding grievances about the alleged flow-through rights of Piedmont and PSA pilots under the various

-7-

collective bargaining agreements. In it, ALPA conceded that negotiations on flow-through rights had not been completed and stated that it "remains interested in completing negotiations that will protect the rights of the US Airways pilots to flow-through to Piedmont and PSA, as well as the rights of the Piedmont and PSA pilots to flow-through to US Airways, but those negotiations have gone forward at a snail's pace and are now completely stalled." The letter clarified that ALPA expected to "continue and complete negotiations of the flow through agreement . . . ."

ALPA included a proposal regarding flow-through rights with its January 12, 2009 letter, and expressed the hope that this proposal would be the basis for swift completion of negotiations. Among other things, ALPA proposed a multi-carrier board of adjustment with jurisdiction over disputes relating to flow-through rights and described the proposed board's jurisdiction, composition, and procedures in detail. Echoing its proposal, ALPA also requested in its letter the creation of a board of adjustment made up of "a pilot and a representative from each carrier, and a representative from US Airways Group," along with a neutral arbitrator.

Airways responded on January 14, 2009, explaining that while the Piedmont and PSA pilots may be able to invoke the grievance and arbitration process set forth in the applicable ALPA

-8-

collective bargaining agreements to pursue claims against the carriers by which they are employed, there is no basis for pilots from those airlines to file any sort of grievances against US Airways, nor is there any basis for the group board of adjustment requested.  In response to ALPA's attached proposal, Airways noted that this new proposal "appears to be an ALPA proposal only and as far as we know is not reflective of a Union flow through proposal presented on behalf of all three pilot groups . . . . We recognized that it might take some time for the . . . union parties to reach consensus on a proposal to present to the Company parties for consideration . . . . We would like to conclude these talks and finalize an agreement regarding the flow-through processes to be implemented at these airlines. However, such an agreement would need to be reached with all applicable parties."

Count One asks the Court to interpret Sections 2, First and 204 of the RLA as requiring the Defendants to establish a multi-carrier board of adjustment with jurisdiction over Group, its three carrier subsidiaries, and USAPA.  See 45 U.S.C. §§ 152, First, 184.  ALPA's interpretation of those sections is wrong. Where Congress sought to mandate a multi-carrier board under the RLA, it did so explicitly.  Section 3, First of the RLA requires the creation of a national, multi-carrier board of adjustment for the railroad industry.  45 U.S.C. § 153, First.  In contrast,

-9-

Section 204 provides that air carriers and their employees "shall" establish adjustment boards, but "may" create multi-carrier boards. 45 U.S.C. § 184. Section 204 further affirms that such multi-carrier boards are to be created by agreement. The plain text of the statute forecloses ALPA's allegation that Group and Airways are statutorily obligated to create a multi-carrier board, and that such a board is created by operation of law rather than consent. Basic principles of statutory interpretation also preclude ALPA's theory that the general dispute-settlement language in Section 2, First should displace the specific language in Section 204. Whatever the scope of Section 2, First, it offers ALPA no relief here. ALPA litigates on behalf of individuals who undisputedly are not employed by Airways or Group, and it is well-settled that Section 2, First governs only the relationship between carriers and their own employees.

The Complaint quotes Section 204 at length, but ignores the import of that text. In contrast to Section 3, First, which mandates the establishment of a national, multi-carrier board of adjustment for carriers by rail called the National Railroad Adjustment Board ("NRAB"), 45 U.S.C. § 153, First the RLA expressly excludes air carriers from the coverage of that section, 45 U.S.C. § 181, and adopts an altogether different approach for the airline industry. Section 204, the provision of

-10-

the RLA specifically governing the creation of boards of adjustment in the airline industry, compels a carrier and its employees to establish a board of adjustment, but unequivocally does not require a multi-carrier board. 45 U.S.C. § 184.

Section 204 states that "[i]t shall be the duty of every carrier and of its employees . . . to establish a board of adjustment . . . ." 45 U.S.C. § 184.  By contrast, it explicitly leaves it to the parties to negotiate over the board's scope: "[s]uch boards of adjustment may be established by agreement between employees and carriers either on any individual carrier, or system, or group of carriers by air and any class or classes of its or their employees . . . ."  Id.  The express text of Section 204 thus mandates the creation of a board of adjustment, but leaves the decision of whether to create a multi-carrier board to the parties' negotiation and consent.

Settled principles of statutory interpretation require adherence to the plain meaning of the section's words.  When Congress carefully contrasts the imperative "shall" with the permissive "may" in the same statutory provision, the plain meaning of those words ordinarily must be given effect.  See United States ex rel. Siegel v. Thoman, 156 U.S. 353, 359-360 (1995) (construing clauses of a Louisiana state statute, explaining that "[i]n the first the word 'shall' and in the latter provision the word 'may,' is used, indicating command in

-11-

the one and permission in the other," and concluding that when "[i]n the law to be construed . . . the word 'may' is used in special contradistinction to the word 'shall,' . . . there can be no reason for 'taking . . . liberty'" with the plain meaning of the statute); see also Lopez v. Davis, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' in the very same section."). The import of these phrases is clear: air carriers and their employees have a statutory duty to establish boards of adjustment, but if they wish to create (and bear the expense of) multi-carrier boards of adjustment, they must contract to do so.

Section 204 makes this conclusion inescapable because it not only employs the permissive "may" in authorizing multi-carrier boards, but also expressly identifies the means by which the scope of a board is to be determined: "agreement." 45 U.S.C. § 184. In so doing, the "by agreement" language confirms what the "may" wording already makes clear: multi-carrier boards of adjustment are creatures of contract, to be created "by agreement" of the carrier and its employees. Count One of the Complaint cannot survive the plain reading of Section 204's text.

Count One of the Complaint is left to rely on Section 2, First's "general duties," Hawaiian Airlines v. Norris, 512 U.S. 246, 255 n. 5 (1994), which include the general "duty of all carriers, their officers, agents, and employees to exert every

-12-

reasonable effort . . . to settle all disputes . . . ."  45
U.S.C. § 152, First.  ALPA's theory appears to be that this
general dispute-settlement language can be understood to compel
multi-carrier boards of adjustment when such a board might be
useful to settle a dispute.  ALPA alleges in its Complaint that
one such "reasonable effort" to "settle all disputes" commanded
by the RLA is Defendants' establishment and utilization of
adjustment boards with sufficient jurisdiction to resolve ALPA's
allegations.

     ALPA's theory would be plausible only if one were to read
Section 2, First in isolation.  ALPA's reading of the general
duties in Section 2, First is inconsistent with the provisions of
Section 204 dealing specifically with the scope of boards of
adjustment.  But "[s]tatutes must be read as a whole," United
States v. Atl. Research Corp., 551 U.S. 128, 135 (2007) (citation
and internal quotation marks omitted).  And "it is a commonplace
of statutory construction that the specific governs the general
. . . ." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384
(1992).  See also  Pressley v. Tupperware Long Term Disability
Plan, 553 F.3d 334, 339 (4th Cir. 2009).

     ALPA's interpretation of Section 2, First, as mandating
multi-carrier boards, conflicts with the plain meaning of Section
204 in two ways.  It conflicts with Section 204's "may" language:
there would be no reason for Section 204 to say that carriers and

-13-

their employees "may" contract for multi-carrier boards if Section 2, First were to say that they 'must.' ALPA's interpretation would rob the "may" language of any effect, undoing Congress's careful distinction between "may" and "shall" in Section 204. 45 U.S.C. § 184.

ALPA's interpretation would undermine Section 204's "by agreement" clause, because it would lead to the creation of multi-carrier boards by statutory mandate rather than by agreement. In fact, ALPA's construction of Section 2, First would altogether eviscerate the "by agreement" language as a practical matter. Multi-carrier boards are only worth requesting when a claimant has a multi-carrier complaint. Moreover, a complainant can almost always argue that a single-carrier board – having jurisdiction over only the carrier and its own employees – is unable to fully resolve a multi-carrier dispute. Hence, under ALPA's construction of Section 2, First, a party that chose not to negotiate for a multi-carrier board could nonetheless obtain one under the RLA – despite the RLA's unequivocal language that multi-carrier boards are to be created "by agreement." Under the regime proposed by ALPA, there would be little reason to expend the resources necessary to bargain for one, and Section 204's "by agreement" phrase would be ignored. Id.

Given the conflict between Section 204's plain meaning and ALPA's proposed interpretation of Section 2, First, the specific

-14-

provisions of Section 204 must prevail even if the general
language of Section 2, First, read in isolation, could plausibly
be interpreted in the manner ALPA prefers.  "[T]he law is settled
that [h]owever inclusive may be the general language of a
statute, it will not be held to apply to a matter specifically
dealt with in another part of the same enactment . . . . Specific
terms prevail over the general in the same or another statute
which otherwise might be controlling."  Fourco Glass Co. v.
Transmirra Prods. Corp., 353 U.S. 222, 228-229 (1957) (citation
and internal quotation marks omitted); see also HCSC-Laundry v.
United States, 450 U.S. 1, 6 (1981) (per curiam) ("[I]t is a
basic principle of statutory construction that a specific statute
. . . controls over a general provision . . ., particularly when
the two are interrelated and closely positioned . . . ."); Farmer
v. Employment Sec. Comm'n, 4 F.3d 1274, 1284 (4th Cir. 1993)
(citing the "basic principle of statutory construction that when
two statutes are in conflict, a specific statute closely
applicable to the substance of the controversy at hand controls
over a more generalized provision.").

Section 2, First is merely a "broad directive" – it says not
a word about adjustment boards – and the more specific language
of Section 204 must be "given precedence over [the] more general
one . . . ."  Corley v. United States, 129 S. Ct. 1558, 1568
(2009) (citation and internal quotation marks omitted).  ALPA's

-15-

attempt to substitute Section 2, First's generalities for Section 204's specific provisions must fail.

Even if ALPA were allowed to ignore the text of Section 204, or displace it with the general language in Section 2, First, the Complaint would fail.  Section 2, First governs only the relationship between a carrier and its own employees, and the duties and rights created extend only to those parties.  Because ALPA litigates solely on behalf of Piedmont and PSA pilots, who are concededly not employed by Airways or Group, it has no Section 2, First cause of action against Airways or Group.

Section 2, First duties do not extend to individuals who are not employed by the carrier.  See Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. 515, 548 (1937) (Section 2, First "at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort[s] to compose differences - in short, to enter into a negotiation for the settlement of labor disputes . . . .").  This is indicated by the text of the provision, which speaks of the duty of "carriers, their officers, agents, and employees," and refers to the "dispute[s] between the carriers and the employees thereof."  45 U.S.C. § 152, First.

Moreover, the structure of Section 2, First indicates that it is not only limited to a carrier's employees, but that it is particularly focused on the relationship between the carrier and

-16-

the representative of its employees.  See Marcoux v. American Airlines, Inc., No. 04 CV 1376, 03 CV 4987, 04 CV 634, 2008 U.S. Dist. LEXIS 55751, at *55-57 (E.D.N.Y. July 22, 2008) ("Section 152, First is directed at the employer's relationship with the employees' certified representative.").

ALPA does not claim to represent Airways employees, and does not purport to represent USAPA.  As such, ALPA has no cause of action against Group or Airways pursuant to Section 2, First.

Although, the RLA does not compel the creation of multi-carrier boards, it does require every "carrier" and its employees to establish a board of adjustment.  45 U.S.C. § 184. Airways is a carrier by air within the meaning of the Act, and it is therefore required to set up a board of adjustment.  But, Airways has indeed established a system board for its own employees and the Complaint does not allege that Airways has failed to make all reasonable efforts toward settling disputes with its own employees.  Accordingly, Count One fails to state a claim upon which relief might be granted against Airways.

In contrast to Airways, Group is not a carrier at all – and ALPA does not allege otherwise.  ALPA's allegation, instead, is that Group acted as the "bargaining agent" of its subsidiaries, and is, therefore, bound by Sections 2, First and 204.  ALPA relies on the text of Section 2, First, which requires not only carriers, but also their agents to exert every reasonable effort

-17-

to settle all disputes.   45 U.S.C. § 152, First.

Assuming for purposes of this Rule 12 motion that ALPA's allegation that Group acted as the "agent" of its subsidiaries is true, ALPA's theory fails as a matter of law.  The general dispute-settlement rule in Section 2, First does not derogate the specific provisions in Section 204.  Section 204 establishes that multi-carrier boards are the product of negotiation, not statutory mandate.  The general language in Section 2, First does not alter this specific rule.  As such, neither an agent's nor a carrier's Section 2, First duties include a statutory obligation to establish a multi-carrier board.

The RLA's text makes clear that, whatever the scope of an agent's Section 2, First duties, the provisions of Section 204 are not included.  Section 204 requires only carriers and their employees to establish adjustment boards, and does not include agents in its dictates.  Congress knew how to place agents within a statutory provision when it wanted to – as evidenced by Section 2, First – and thus its decision to exclude agents from Section 204's command must be respected.  Nelson v. Piedmont Aviation, Inc., 750 F.2d 1234, 1236 (4th Cir. 1984) ("The presence of this section demonstrates Congress' ability to cover prospective employees when it wishes . . . .").  Accordingly, there is no merit to ALPA's allegation that Group breached Section 204 by failing to create a multi-carrier board; Group does not have the

-18-

obligation of establishing an adjustment board of any kind.

ALPA's statutory "bargaining agent" theory fails as a matter of law for a more basic reason:  the alleged agency relationship was limited to bargaining, and thus Group's Section 2, First duties would likewise have been limited to the bargaining process.  Although the Complaint variously casts Group as the "bargaining agent," and also more generally as the "agent" of its subsidiaries, the only factual allegation of agency is that Group acted as its subsidiaries' "bargaining" agent, ("Group is also an agent of each of the Group Subsidiaries, authorized to contractually bind each of the Group Subsidiaries.").  And under ALPA's "bargaining agent" theory, Group's Section 2, First duties are necessarily limited to the bargaining process; an agent for one purpose is not necessarily an agent for all purposes.

Because a bargaining agent has no lingering post-bargaining duty under the RLA to assist in the settling of subsequent disputes, ALPA's claim fails as a matter of law:  ALPA altogether fails to allege that Group fell short of Section 2, First during the agency relationship, say, by thwarting the collective bargaining process of its subsidiaries, or otherwise failing to make reasonable efforts to ensure that collective bargaining agreements were put in place.  In fact, ALPA affirmatively alleges that the subsidiaries did enter into collective bargaining agreements.  As the Complaint itself establishes,

-19-

Group more than fulfilled whatever Section 2, First duties it might have had as "bargaining agent."

In Count Two of the Complaint, ALPA alleges that Group has breached its contractual commitments to arbitrate disputes over its contractual undertakings.  In this regard, ALPA appears to allege two separate theories.  ALPA alleges that the 2002 Restructuring Agreement incorporates the duties in Section 2, First and Section 204 of the RLA, and that by signing the agreement Group contractually bound itself to those statutory provisions.  And those provisions, according to ALPA, require Group to arbitrate disputes arising from the agreement.  ALPA also alleges that Group is obligated by the terms of LOA 8 between PSA and ALPA to arbitrate disputes arising from the 2002 Restructuring Agreement, as amended by LOA 91.

ALPA alleges that Group is required to create a multi-carrier board of adjustment because it was a signatory to the 2002 Restructuring Agreement.  ALPA contends that Group is so required because the 2002 Restructuring Agreement incorporated Airways' obligation under RLA Section 2, First and Section 204 to establish an arbitral adjustment board to resolve disputes growing out of the interpretation or application of the Small Jet Agreement.

This allegation fails because it only gets ALPA as far as Sections 2, First and 204.  These sections do not require the

-20-

establishment of a multi-carrier board of adjustment.  Although Section 204 provides that a carrier and its employees shall establish a board of adjustment, it explicitly states that the parties may contract for a multi-carrier board.  Thus, setting aside whether the contract actually incorporates any RLA obligations, ALPA's allegation fails because it is based on the flawed premise that the RLA requires creation of a multi-carrier board of adjustment, which it clearly does not. Therefore, Group's execution of the 2002 Restructuring Agreement cannot create a contractual obligation to establish a multi-carrier board of adjustment.

ALPA alleges that, regardless of whether the RLA compels Group to create a multi-carrier board of adjustment, Group has breached its contractual obligations under LOA 8 to participate in the resolution of the Piedmont and PSA pilots' flow-through grievances and to establish an arbitral adjustment board with sufficient jurisdiction to resolve disputes arising from the denial of Piedmont and PSA pilots' flow-through rights.  ALPA bases this allegation on a provision of LOA 8 entitled Dispute Resolution Procedures.  That LOA 8 provision states that the parties to the Dispute Resolution Procedures will be US Airways, PSA and ALPA, representing the pilots of US Airways and the PSA Carriers.  Because LOA 8 later refers to US Airways Group in Section 9.e of the Dispute Resolution Procedures, it is unclear

-21-

whether the alleged party to the Dispute Resolution Procedures is Group or Airways. For the purposes of this lawsuit, however, that issue does not matter because Group was not a signatory to LOA 8.

As a non-signatory to LOA 8, Group cannot be sued for an alleged breach of that contract. The Fourth Circuit has endorsed the commonsense rule that, in the labor law context, "a suit against a non-signatory of a contract cannot be considered a suit for violation of the contract." Int'l Union, United Mine Workers v. Covenant Coal Corp., 977 F.2d 895, 897 (4th Cir. 1992) (LMRA Section 301 preemption). In Covenant Coal Corp., the Fourth Circuit agreed with the lower court's reasoning that "[i]t is axiomatic that only a party to a contract can violate that contract. A contract governs only the conduct of the parties who have agreed to its terms." Id. (internal quotations omitted).

Here, ALPA itself concedes that Group was not a signatory to LOA 8 and, in fact, PSA and ALPA were the only signatories to LOA 8. As a result, ALPA's claim against Group for breach of alleged contractual obligations under LOA 8 cannot be sustained.

To the extent ALPA purports to rely on a veil-piercing theory, the Complaint's factual allegations fall short. Courts have recognized that "there is no policy of federal labor law, either legislative or judge-made, that a parent corporation is bound by its subsidiary's labor contracts simply because it

-22-

controls the subsidiary's stock and participates in the subsidiary's management." <u>Am. Bell Inc. v. Fed'n of Tel. Workers</u>, 736 F.2d 879, 887 (3d Cir. 1984) (citing <u>United Paperworkers Int'l Union v. T.P. Prop. Corp.</u>, 583 F.2d 33, 35-36 (1st Cir. 1978)).  Instead, the questions in federal veil-piercing cases are whether the parent company has engaged in fraudulent conduct and whether it so abused or ignored the independence of its subsidiaries that the parent and subsidiary should be treated as a single company.

ALPA's Complaint nowhere alleges that Group engaged in fraud.  While the Complaint alleges that Group participates in and exercises control over the operations of the Group Subsidiaries, it does not go so far as to allege that the carriers ceased entirely to operate as independent businesses, and the Complaint does not allege that ALPA believed the carriers were mere sham operations.  Accordingly, ALPA cannot rely on a veil-piercing theory to extend alleged contractual obligations to Group based on a contract that Group did not sign.

For the foregoing reasons, Defendants' US Airways Group, Inc., US Airways, Inc., Piedmont Airlines, Inc., and PSA Airlines, Inc. Joint Motions to Dismiss should be GRANTED.

-23-

An appropriate order shall issue.


                                              /s/
                                     _____
                                        Claude M. Hilton
                                     United States District Judge


Alexandria, Virginia
August 25 , 2009